

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID M. MILCH, Individually and as
Custodian for JASON ADAM MILCH, and
On Behalf of All Others Similarly Situated,

        Plaintiffs,

v.

THE GOLDMAN SACHS GROUP, INC.
and GOLDMAN, SACHS & CO.,

        Defendants.

08 CV 3659

CLASS ACTION COMPLAINT
FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS

JURY TRIAL DEMANDED

U.S.D.C. S.D.N.Y.
CASHIERS

    Plaintiffs, by their undersigned attorneys, allege the following upon personal knowledge as to plaintiffs and their own acts and upon information and belief as to all other matters based upon the investigation made by and through their attorneys, which investigation included, among other things, a review of the public documents, media reports, and news releases concerning the defendants, and defendants' public filings with the U.S. Securities and Exchange Commission (the "SEC").

## SUMMARY OF ACTION

    1.    This is a federal class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities who purchased and/or repurchased auction rate securities (also known as auction rate preferred stock, auction market preferred stock, variable rate preferred securities, money market preferred securities, periodic auction rate securities and auction rate bonds) offered for sale by defendants between March 25, 2003 and February 13, 2008, inclusive (the "Class Period").

    2.    Defendants represented to investors that auction rate securities were equivalent to cash or money market funds, were highly liquid investments suitable for short-term investing,

and suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

3. Defendants knew, but failed to disclose to investors, material facts about auction rate securities. Specifically, defendants knew, but failed to disclose that auction rate securities were not cash alternatives, but were instead, complex, long-term financial instruments with 30-year maturity dates or no maturity at all. Defendants knew, but failed to disclose that auction rate securities were only liquid at the time of sale because the auction market was artificially supported and manipulated by various broker-dealers to maintain the appearance of liquidity and stability. Defendants knew, but failed to disclose that auction rate securities would become illiquid as soon as the broker-dealers stopped maintaining the auction market.

4. On February 13, 2008, approximately 87% of all auctions of auction rate securities failed when all major broker-dealers refused to continue to support the auctions. As a result of the withdrawal of support by all of the major broker-dealers, the market for auction rate securities collapsed, leaving the holders of these auction rate securities with no commercially reasonable means of liquidating the investments defendants offered and sold as a suitable alternative to money market funds and other short-term cash management vehicles.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. 240.10b-5).

6. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28

2

U.S.C. §1391(b), §1337. Defendants maintain offices within this District and many of the acts giving rise to the violations complained of herein took place in this District.

7. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

8. Plaintiff David M. Milch, as set forth in the accompanying certification, incorporated by reference herein, purchased auction rate securities sold by defendants during the Class Period on his own behalf and as Custodian for plaintiff Jason Adam Milch.

9. Defendant The Goldman Sachs Group, Inc., a Delaware company, through its wholly owned subsidiary, defendant Goldman, Sachs & Co., a New York company, both headquartered in New York, New York, provides investment banking and securities brokerage services to corporate and private retail clients.

10. Unless specifically noted, "Goldman Sachs" refers collectively to defendants The Goldman Sachs Group, Inc. and Goldman, Sachs & Co.

## CLASS ACTION ALLEGATIONS

11. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased or repurchased auction rate securities from Goldman Sachs between March 25, 2003 and February 13, 2008, inclusive (the "Class"). Excluded from the Class are defendants, the officers and directors of any defendant, members of their immediate families and their legal

3

representatives, heirs, successors or assigns and any entity in which any defendant has or had a controlling interest.

12. The members of the Class are so numerous that joinder of all members is impracticable. The market for auction rate securities, while it existed, was estimated to exceed $300 billion in the United States and Goldman Sachs was a broker-dealer of auction rate securities while the market for such securities existed. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

13. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) Whether statements made by defendants to the investing public during the Class Period misrepresented or omitted material facts about the liquidity of and risks associated with auction rate securities and the market for such securities; and

(c) To what extent the members of the Class have sustained damages and the proper measure of damages.

14. Plaintiffs' claims are typical of the claims of the members of the Class as all

4

members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

15. Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

16. Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

17. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

18. In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) because: (a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

**Background**

19. The term "auction rate security" typically refers to either municipal or corporate debt securities or preferred stocks which pay interest at rates set at periodic "auctions." Auction rate securities generally have long-term maturities, typically 30 years, and in the case of preferred stocks, no maturity date.

20. Auction rate securities were first introduced in the 1980s. Since then, the market for auction rate securities has grown dramatically and the current estimated value of auction rate securities in existence (prior to the collapse of the auction market) is approximately $300 billion.

21. Investments in auction rate securities were initially limited to institutional investors, with required minimums of $250,000. In recent years, however, issuers and sellers of auction rate securities have lowered the minimum amount invested to $25,000 in an effort to market auction rate securities as widely as possible to the general public.

22. Auction rate securities were auctioned at par value, so the return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate or dividend yield set through the auction. The method for auctioning the securities was described in the applicable disclosure documents for the securities being offered, though the formula was substantially similar for all securities offered as auction rate securities.

23. The number of days between each auction was set by the prospectus. Generally, the auctions were held every 7, 28, or 35 days, with interest paid at the end of the auction period.

24. The auctions are commonly referred to as a "Dutch" auction, in which bids with successively higher rates were accepted until all of the securities at auction were sold.

6

25.    At the end of the auction, the rate at which all of the securities were sold was set uniformly and was called the "clearing rate." The clearing rate was determined by finding the lowest rate bid which was sufficient to cover all of the securities for sale in the auction. If several bidders had bids at the clearing rate, and there were more bids than shares, the shares were divided pro-rata between the clearing rate bidders. The "auction agent," at the end of the auction, allocated the shares per the formula. If all of the current holders decided to hold their securities, then the auction was an "all-hold" auction and the rate was set at a pre-determined level defined in the prospectus. The all-hold rate was generally lower than the market rate.

26.    Typically, during an auction investors may only submit the following types of orders: 1) "Hold," which is the default order for current investors (*i.e.*, the order that is entered for a current holder if the holder takes no action), where a current investor will keep the securities at the rate at which the auction clears; 2) "Hold-at-Rate," where a current investor will only keep the securities if the clearing rate is at or above the specified rate; 3) "Sell," where a current investor will sell the securities regardless of the clearing rate; or 4) "Buy," where a prospective investor, or a current investor who wants more securities, will buy securities if the clearing rate is at or above the specified rate.

27.    Disclosure documents often state that an investor's order is an irrevocable offer. The final rate at which all of the securities are sold is the "clearing rate" that applies to all of the securities in the auction until the next auction. Bids with the lowest rate and then successively higher rates are accepted until all of the sell orders are filled. The clearing rate is the lowest rate bid sufficient to cover all of the securities for sale in the auction. The following table illustrates the operation of an auction where $100,000 of auction rate securities are for sale and

7

the auction received four bids:

| Investor A | Bids to buy $50,000 at 1.10% | Bids with the lowest desired rates are filled first. | Buys $50,000 at 1.15% |
|---|---|---|---|
| Investor B | Bids to buy $50,000 at 1.15% | | Buys $25,000 at 1.15% |
| Investor C | Bids to buy $50,000 at 1.15% | Clearing rate in this example is 1.15%* | Buys $25,000 at 1.15% |
| Investor D | Bids to buy $25,000 at 1.20% | | No Allocation |

* This is the lowest rate at which there are buyers willing to purchase all of the securities offered for sale in the auction.

28. In the example above, Investors B and C receive pro-rata allocations (up to their bid limit) of the securities remaining after Investor A's order has been filled. Investor D, whose bid in this auction turned out to be above the clearing rate, received no allocation because all the securities available were already sold to investors who bid at or below the clearing rate, and thus had their orders filled first ($50,000+ $25,000+ $25,000 = $100,000).

29. The issuer of each auction rate security selected one or more broker-dealers to underwrite the offerings and to manage the auction process. Investors could only submit orders through the selected broker-dealers. The issuer paid a fee to each broker-dealer engaged to manage an auction.

30. Investors were required to submit an order to the broker-dealer by a deadline set by the broker-dealer. This deadline was generally set early enough by the broker-dealer so that it had time to process and analyze the orders before having to submit the orders to the auction agent. This gave the broker-dealer enough time to determine what, if any, orders the broker-dealer wished to place for its own account.

31. Broker-dealers would often engage in a number of practices to influence the

8

auction process, including, for example, submitting their own orders to purchase or sell shares for their own accounts. In 2004, the SEC began to investigate these manipulative practices affecting the auction market. On May 31, 2006, the SEC entered into a consent decree with a number of major broker-dealers (including Goldman, Sachs & Co., a defendant herein) which required them to disclose certain practices to investors and to stop engaging in certain other practices. The SEC consent decree noted that in many cases the broker-dealers intervened in auctions for their own benefit rather than to maintain liquidity, as they claimed. The SEC consent decree did nothing to end the practice of the broker-dealers submitting bids for their own accounts after receiving notice of what orders their customers planned to place, so long as the broker-dealers disclosed this practice to their customers.

**During the Class Period, Defendants Materially Misrepresented the Liquidity and Risks of Auction Rate Securities and Omitted Material Facts About the Auction Market**

32. In order to perpetuate the auction market and sell as many auction rate securities as possible, Goldman Sachs represented to investors that auction rate securities were the same as cash and were highly liquid, suitable investments for short-term investing. Pursuant to uniform sales materials, Goldman Sachs financial advisors throughout the United States represented to current and potential Goldman Sachs clients that the auction rate securities sold by Goldman Sachs were equivalent to cash or money market funds and were safe, highly liquid short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

33. Goldman Sachs failed to disclose to purchasers of auction rate securities material facts about these securities. Goldman Sachs failed to disclose that these securities were not cash

9

alternatives, like money market funds, and were instead, complex, long-term financial instruments with 30-year maturity dates (or no maturity at all, as in the case of preferred stock). Goldman Sachs failed to disclose that the auction rate securities it was selling were only liquid at the time of sale because broker-dealers in the auction market were artificially supporting and manipulating the market to maintain the appearance of liquidity and stability. In fact, at all relevant times during the Class Period, the ability of holders of auction rate securities to liquidate their positions depended on the maintenance of an artificial auction market maintained by broker-dealers. When broker-dealers stopped artificially supporting and manipulating the auction market, the market immediately collapsed and the auction rate securities sold by Goldman Sachs became illiquid. Goldman Sachs also failed to disclose that the auction rate securities it was selling were not short-term investments, but rather long term bonds, or preferred stocks with no maturities. Finally, Goldman Sachs failed to disclose that the short-term nature of the securities and the ability of investors to quickly convert their auction rate securities into cash depended entirely on the perpetuation of the artificial auction market being maintained by broker-dealers.

34.     Goldman Sachs also failed to disclose to purchasers of auction rate securities material facts about its role in the auctions and the auction market in which these securities were traded. Goldman Sachs failed to disclose that broker-dealers routinely intervened in auctions for their own benefit, to set rates and prevent all-hold auctions and failed auctions. Goldman Sachs failed to disclose that without this manipulation of the auction market, many auctions likely would have failed, as a result of which investors would have had the ability to determine the true risk and liquidity features of auction rate securities. Goldman Sachs continued to aggressively market auction rate securities after it had determined that broker dealers were likely to withdraw

their support for the periodic auctions and that a "freeze" of the market for auction rate securities would result.

35.     During the Class Period, Goldman Sachs failed to disclose that the auctions it participated in on behalf of its clients were not governed by arm's-length transactions but instead suffered from systemic flaws and manipulative practices, including allowing customers to place open or market orders in auctions, preventing failed auctions and all-hold auctions to set the market rate, submitting or changing orders after auction deadlines, not requiring customers to purchase partially-filled irrevocable orders, providing certain customers with higher returns than the auction clearing rate, and providing inside information about the auction process to certain customers in connection with the auction bidding.

**The Market for Auction Rate Securities Collapses**

36.     In the summer of 2007, some auctions for auction rate securities backed by sub-prime debt began to fail, but these securities represented only approximately 2-6% of the entire auction rate securities market. In the fall and winter of 2007, more auctions began to fail. However, Goldman Sachs nevertheless continued to encourage investors to purchase auction rate securities and continued to represent to investors that these securities were the same as cash or money markets and were highly liquid, safe investments for short-term investing, without any disclosure of the risks associated with the securities.

37.     On February 13, 2008, approximately 87% of all auctions of auction rate securities failed when all of the major broker-dealers refused to continue to support the auctions.

38.     On February 14, 2008, it was disclosed that UBS, the second largest underwriter of auction rate securities, had decided to no longer support the auction market. Virtually every

11

other major broker-dealer, including Goldman Sachs, Lehman Brothers, Citigroup and Merrill Lynch, among others, also decided around the same time to withdraw their support of the auction market. As a result of the withdrawal of support by all of the major broker-dealers, the market for auction rate securities has collapsed, rendering more than $300 billion of outstanding securities illiquid.

39.    The market for auction rate securities sold by Goldman Sachs was open, well-developed and efficient at all relevant times until the actual risks and liquidity of auction rate securities emerged and the auction market collapsed. As a result of the materially false and misleading statements and failures to disclose, auction rate securities sold by Goldman Sachs traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or repurchased auction rate securities sold by Goldman Sachs relying upon the integrity of the auction market and the market price of those securities, and have been damaged thereby.

40.    During the Class Period, defendants materially misled the investing public, thereby allowing the auction market to continue and inflating the price of auction rate securities sold by Goldman Sachs by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements concerning auction rate securities, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the auction market and the auction rate securities sold by Goldman Sachs, as alleged herein.

41.    At all relevant times, the material misrepresentations and omissions described

12

herein directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about the auction market and the auction rate securities sold by Goldman Sachs. These material misstatements and omissions had the cause and effect of perpetuating the auction market and creating in that market an unrealistically positive assessment of the auction rate securities sold by Goldman Sachs, thus causing those securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiffs and other members of the Class purchasing auction rate securities sold by Goldman Sachs at artificially inflated prices, thus causing the damages complained of herein.

## NO SAFE HARBOR

42.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an

13

executive officer of Goldman Sachs who knew that those statements were false when made.

## LOSS CAUSATION / ECONOMIC LOSS

43. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the value and liquidity of auction rate securities and operated as a fraud or deceit on acquirers of auction rate securities purchased from Goldman Sachs.

44. As detailed above, when the truth about the true nature of the auction rate securities auction market was revealed, the auction rate securities held by members of the Class became illiquid and declined in value as a result of the illiquidity. This decline in the liquidity and value of auction rate securities was a direct result of the nature and extent of Goldman Sachs' fraud finally being revealed to investors and the market. The timing of the illiquidity in auction rate securities and magnitude of the price decline negates any inference that the loss suffered by plaintiffs and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or other facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by the plaintiffs and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the auction rate securities price by manipulating the auction markets and the subsequent significant decline in the liquidity and value of auction rate securities sold by Goldman Sachs after defendants' prior misrepresentations and other fraudulent conduct was revealed.

45. At all times relevant hereto, Goldman Sachs' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the plaintiffs and other Class members. These statements were materially false and misleading

14

because they failed to disclose a true and accurate picture of the auction rate securities auction market as alleged herein. Throughout the Class Period, defendants publicly issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the market price of auction rate securities to be artificially inflated. Plaintiffs and other Class members purchased auction rate securities at these artificially inflated prices and were damaged thereby.

## COUNT I

### Violations Of Section 10(b) Of The Exchange Act
### Against All Defendants

46.　Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein.

47.　During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; (ii) enable defendants to sell hundreds of millions, if not billions, of dollars of auction rate securities to current and prospective Goldman Sachs clients, and on which Goldman Sachs made substantial commissions and/or fees; and (iii) cause plaintiffs and other members of the Class to purchase auction rate securities from Goldman Sachs at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

48.　Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the

15

statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from Goldman Sachs in an effort to maintain artificially high sales and market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

49.  Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the auction rate securities sold by Goldman Sachs, as specified herein.

50.  These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors that the auction rate securities sold by Goldman Sachs were the same as cash and were highly liquid, safe short-term investment vehicles suitable for almost all investors, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the auction rate securities in the light of the circumstances under which they were made, not misleading, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from Goldman Sachs during the Class Period.

51.  The defendants had actual knowledge of the misrepresentations and omissions of material facts as described herein, or acted with deliberate disregard for the truth in that they

failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions were done knowingly or deliberately and for the purpose and effect of concealing the truth about the liquidity of and risks associated with auction rate securities from the investing public and supporting the artificially inflated price and market for these securities. If defendants did not have actual knowledge of the misrepresentations and omissions alleged, they were deliberate in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

52. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as described above, the market and market price of the auction rate securities sold by Goldman Sachs was artificially inflated during the Class Period. In ignorance of the fact that the market prices of auction rate securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the auction market in which the auction rate securities were traded, and/or on the absence of material adverse information that was known to or deliberately disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired auction rate securities sold by Goldman Sachs during the Class Period at artificially high prices and were damaged thereby.

53. At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other members of the Class and the marketplace known the truth regarding the liquidity of and risks associated with the auction rate securities sold by Goldman Sachs, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased and

17

continued to hold their auction rate securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

54.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

55.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of auction rate securities sold by Goldman Sachs during the Class Period.

## COUNT II

### Violations Of Section 20(a) Of The Exchange Act
### Against Defendant The Goldman Sachs Group, Inc.

56.     Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein.

57.     Defendant The Goldman Sachs Group, Inc. acted as a control person of defendant Goldman, Sachs & Co. within the meaning of Section 20(a) of the Exchange Act as alleged herein. The Goldman Sachs Group, Inc., by virtue of its 100% ownership of Goldman, Sachs & Co., had the power to influence and control and did influence and control, directly or indirectly, the decision-making by Goldman, Sachs & Co., including the content and dissemination of the various statements which plaintiffs contend are false and misleading. The Goldman Sachs Group, Inc. was provided with or had unlimited access to copies of the reports, press releases, public filings and/or other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58.     As set forth above, Goldman, Sachs & Co. violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this complaint. By virtue of its position as a controlling person, The Goldman Sachs Group, Inc. is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchase and retention of auction rate securities from Goldman Sachs during the Class Period.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiffs as Lead Plaintiff and certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and E. Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

DATED: April 15, 2008

**GLANCY BINKOW & GOLDBERG LLP**

By: _____
Lionel Z. Glancy
Robert M. Zabb (RZ-0625)
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**TOPTANI LAW OFFICES**
Edward Toptani
127 E. 59th St., Third Floor
New York, New York 10022
Telephone: (212) 699-8930
Facsimile: (212) 699-8939

*Attorneys for Plaintiffs*